UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-mc-25775

IN RE APPLICATION OF
DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT,

     *Petitioner*,

vs.

ALEKSEI KILIKO,

     *Respondent*.

_____/

**EMERGENCY PETITION FOR ENTRY OF ORDER PERMITTING
INVOLUNTARY ADMINISTRATION OF (1) MEDICAL MONITORING AND
(2) IF DEEMED MEDICALLY NECESSARY, INTRAVENOUS HYDRATION**

Petitioner, United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), files this *Emergency Petition for Entry of Order Permitting Involuntary Administration of (1) Medical Monitoring and (2), if Deemed Medically Necessary, Intravenous Hydration* to Respondent Aleksei Kilko.

Petitioner is not seeking authority to involuntarily administer <u>nutrition</u> to Respondent at this time.

### I.      Parties, Jurisdiction & Venue

1.      Petitioner is the United States Department of Homeland Security, Immigration and Customs Enforcement, an agency of the United States government.

2.      Respondent Aleksei Kilko (Respondent) is non-citizen lawfully in detention at the Krome Service Processing Center (Krome), Miami, Florida. Respondent is in ICE custody, pending the completion of his removal proceedings under the Immigration and Nationality Act.

3. This Court has jurisdiction of this matter under 28 U.S.C. § 1345 and 8 U.S.C. § 1329.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## II. Factual Background

5. Respondent is a native and citizen of Russia, currently detained at Krome. *See* **Exhibit A**, Declaration of Assistant Field Office Director Charles Parra ("Parra Decl."), ¶ 4.

6. On December 7, 2025, Respondent was transferred to Krome from the Folkston ICE Processing Center in Folkston, Georgia ("Folkston"), for continuity of medical care due to his ongoing hunger strike. *Id.* at ¶ 5; s*ee also* **Exhibit B**, Declaration of Manuel E. Lopez Diaz, M.D. ("Lopez Decl."), ¶ 4.

7. As of today, Respondent is on day 36 of a hunger strike and has missed over 104 meals. Lopez Decl. at ¶ 5. His hunger strike began on November 8, 2025, while Respondent was detained at Folkston. *Id.*

8. Respondent states that he is on a hunger strike to protest his continued detention and because he wishes to be transferred to California. Parra Decl., ¶ 5; Lopez Decl., ¶ 5.

9. Since his transfer to Krome, Respondent has refused to sign a medical consent. Lopez Decl., ¶ 6. He is refusing to be weighed, to permit physical examinations, and to allow blood to be collected for laboratory testing. *Id.*; *see also id.* at ¶ 8.

10. Respondent also refused to consent to medical care while he was detained at Folkston—refusing physical examinations and to allow his vital signs to be taken, to submit to laboratory testing, or even to be weighed. *Id.* at ¶ 10.

11. Respondent's last known weight was taken on November 14, 2025, which, at

that time, evidenced a loss of 14 pounds or 8% of his initial, pre-hunger strike body weight. *Id.*

12.     But given his refusal to consent to weight checks since November 14, medical staff at Krome are unable to determine his current weight or, importantly, to determine his current percentage of weight loss. *Id.* at ¶¶ 13-14; *see also id.* at ¶¶ 17-18.

13.     A psychiatrist at Folkston evaluated Respondent on December 2, 2025 and found no evidence of a psychiatric condition causing him to refuse food or hydration; rather, he appears to be operating under his own free will. Lopez Decl. at ¶ 11.[1]

14.     Respondent has been counseled via a Russian interpreter regarding the adverse health consequences of his continued hunger strike. *Id.* at ¶ 12; Parra Decl., at ¶ 6. Medical staff have repeatedly tried to persuade him to eat food and obtain adequate hydration, to no avail. Parra Decl., at ¶ 6.

15.     Respondent has also been informed that relief from a court may be necessary to preserve his life and health if he continues to deprive himself of necessary nutrients and hydration, and that such relief may include involuntary hydration and, if necessary, feeding procedures. *Id.* at ¶ 7. Lopez Decl., ¶ 12.

16.     **Of dire concern, at present, Respondent is not voluntarily consuming sufficient oral hydration**. Lopez Decl., ¶ 8; ¶ 22. His refusal to do so and the resulting dehydration can drastically exacerbate the effects of his hunger strike. *Id.* at ¶ 17.

17.     Respondent's continued hunger strike is jeopardizing his health and may lead to permanent bodily harm, including organ failure and/or death, if he does not consume

---

[1] This statement is not intended to convey that Respondent has no mental health issues, generally. Rather, this statement is intended only to convey that, based on a clinical evaluation, no discernable psychiatric condition is causing Respondent to refuse food, proper hydration, or medical care.

sufficient calories and hydration to preserve his health. Lopez Decl., ¶¶ 21-22.

### III.     Court intervention is medically necessary

18.     Despite Petitioner's best efforts, Respondent's continued refusal to consent to his own medical care, together with his refusal to consume sufficient hydration voluntarily, requires immediate medical intervention to determine and monitor Respondent's current state and to prevent deterioration and serious medical complications, including potential injury, organ failure, or death. Lopez Decl., ¶¶ 14-20.

19.     Respondent's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. Respondent is already exhibiting signs and symptoms of orthostatic blood pressure changes, which are caused by dehydration and may cause dizziness.  In addition, Respondent has had a decreased urinary output, which is indicative of both dehydration and hypotension. *Id.* at ¶ 18.

20.     If fasting and insufficient hydration continues, Respondent risks permanent damage to his internal organs which has the potential to become life threatening. *Id.* at ¶ 21. Metabolic imbalance, if left untreated, will cause fatal arrhythmias and/or cardiac arrest. *Id.*

21.     Accordingly, it is the professional medical judgment of Respondent's treating physician at Krome that involuntary routine medical examinations and laboratory testing—including physical evaluations, vital sign checks, weight checks, and urine and blood collection are necessary at this time. *Id.* at ¶¶ 15; 22-24; 26.

22.     Petitioner also seeks authority to involuntarily administer hydration to Respondent via IV, but notes that would only be pursued if deemed medically necessary, depending on the results of Respondent's labs and physical evaluations. *Id.* at ¶ 25.

23. To ensure Respondent's health, welfare, and safety—should he refuse to cooperate with the authorized medical examinations, laboratory draws, and/or involuntary hydration—medical soft restraints will be required to immobilize Respondent and prevent unnecessary injury to both Respondent and to medical staff. *Id.* at ¶ 27.

24. Petitioner is not seeking authority to involuntarily administer *nutrients* to Respondent at this time.

### IV. Maintaining security and good working order at Krome

25. As Respondent's custodian, ICE has an obligation to preserve his health while he is in ICE custody. *See* attached Memorandum of Law.

26. The decline in Respondent's health and well-being brought on by his refusal to eat and drink sufficient water poses a serious threat to the security and good order of the Krome detention center. Parra Decl., ¶¶ 8-9.

27. In order to preserve the life of the Respondent and maintain security and order at Krome, Petitioner needs to involuntary provide routine medical examinations, laboratory testing, and—if deemed medically necessary—intravenous hydration, to preserve and sustain the life of Respondent. Lopez Decl., ¶ 26.

28. Given Respondent's refusal to consent to his own medical care and the resulting the uncertainty regarding his current medical state and the true effects of his 36-day hunger strike, it is possible his lab results will evidence more serious strike-induced medical conditions. Respondent may need to be transferred to Larkin Community Hospital, Inc. in Miami, Florida ("Larkin") for continuity of care. Petitioner therefore requests that any order granting this petition also apply to medical staff at Larkin.

29. Finally, Petitioner requests that any order granting the relief sought in this Petition remain in effect until such time that Respondent's food and water consumption is voluntary, continuous, and sufficient as determined by the medical staff at ICE or Larkin, in their clinical judgment and in consideration of objective data, including but not limited to Respondent's lab results and weight gain, or, alternatively, for at least 60 days.

**WHEREFORE**, Petitioner prays the Court:

a. Find that an emergency situation exists, requiring immediate action;

b. Enter an order authorizing ICE, acting through competent medical authority, including Larkin and any of its staff physicians, to perform involuntary examinations and laboratory tests on Respondent, including physical evaluations, vital sign checks, weight checks, and urine and blood collection, for the duration of Respondent's hunger strike;

c. Enter an order authorizing ICE, acting through competent medical authority, including Larkin and any of its staff physicians, to involuntarily administer hydration to Respondent through an intravenous line to prevent further deterioration of his health, if such action is deemed medically necessary based on the results of Respondent's laboratory testing;

d. Enter an order authorizing ICE, through competent medical authority, including Larkin and any of its staff physicians, to restrain Respondent with medical soft restraints *if he resists or asserts that he intends to resist* the administration of nutrients and hydration;

e. Permit the order, in the form attached hereto, to remain in place until such time that Respondent's food and water consumption is voluntary, continuous, and sufficient as determined by the medical staff at ICE or Larkin, in their clinical judgment and in consideration of objective data, including but not limited to Respondent's lab results and

weight gain; and

f.      Enter such further relief as the Court deems appropriate under the circumstances.[2]

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:     *Zakarij N. Laux*
ASSISTANT U.S. ATTORNEY
Florida Bar No. 93784
United States Attorney's Office
99 N.E. 4th Street, Suite 500
Miami, Florida 33132
(305) 961-9053
Zakarij.Laux@usdoj.gov

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing (with all attachments) was hand-delivered on December 10, 2025 to Respondent at Krome, where he is legally detained. It was also served that same day, as a courtesy, on Respondent's counsel in his underlying immigration proceedings, via email to: John Peng, Esq., johnhcpeng@gmail.com and Michael Yurasov-Lichtenberg, Esq., Mike.l.berg1@gmail.com.

*Zakarij N. Laux*


---

[2] Although there is persuasive district precedent (discussed in the attached memorandum of law) for the entry of fulsome relief on an ex parte basis, should the Court desire to hold a hearing, Petitioner's counsel respectfully requests that the Court enter an ex parte order of limited duration allowing Respondent to intervene medically as soon as possible to prevent further deterioration to his health. Counsel also requests that any scheduled hearing take place remotely, as Respondent is not currently (and will likely not be in the near future) in a medically stable state that would allow him to be transported to downtown Miami. For any hearing, although Respondent speaks Spanish, his native language is Russian. Respondent would require the services of a Russian interpreter.