**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 25-_____**

IN RE APPLICATION OF
DEPARTMENT OF HOMELAND
SECURITY, IMMIGRATION AND
CUSTOMS ENFORCEMENT,

Petitioner

v.

Aleksei KILKO,
Axxx-xxx-714

Respondent _____/

**DECLARATION OF MANUEL E LOPEZ DIAZ, M.D.**

I, Manuel E Lopez Diaz, make the following statements under oath and subject to the penalty of perjury pursuant to the provision of 28 U.S.C. § 1746.

1.  I am a licensed, Board-Certified Emergency Medicine physician assigned to the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), ICE Health Service Corps (IHSC) as the Staff Physician at the Krome Service Processing Center (Krome). I have held this position since March 26, 2023. I have 30 years of experience as an emergency medicine physician working for critical access hospitals to Level I trauma centers.

2.  As the Staff Physician at Krome, my duties include providing medical care for detainees at the facility. This declaration is made in support of the Petition filed by DHS/ICE to perform involuntary physical examinations, periodic laboratory tests (blood and urine), daily vital signs with weight, and, if required, intravenous hydration for Mr. Aleksei KILKO ("Mr. Kilko" or "the patient"), who is detained at Krome. I am the treating physician

1

of Mr. Kilko, and I make this declaration upon a review of his medical record and my examination and treatment of him.

3. ICE is committed to ensuring that every person detained in its custody receives timely access to necessary and appropriate medical, dental, and mental health care and treatment while in custody. The health, safety, and welfare of those detained in its custody are among the agency's highest priorities, and IHSC has protocols in place to ensure that any patient on a hunger strike within its detention facilities is promptly and appropriately addressed and treated.

4. The patient is a native of Russia. He arrived at Krome on December 7, 2025, after transfer from Georgia, for continuity of care due to his ongoing hunger strike.

5. On November 8, 2025, Mr. Kilko missed his ninth consecutive meal and was classified as a hunger striker pursuant to IHSC guidance. Mr. Kilko states that he is on a hunger strike to protest his continued detention and because he wants to be transferred to California. He is on day 36 of his hunger strike and has missed 104 meals as of breakfast this morning. He has had periods in which he has consumed no water or food since he initiated his hunger strike while being detained in Georgia, and while in transit to Krome. When Mr. Kilko first began his hunger strike in Georgia, he refused to allow medical staff to weigh him.

6. I do not know Mr. Kilko's current weight because since his transfer to Krome's medical clinic on December 8, 2025, Mr. Kilko refuses to sign a medical consent, to be weighed or to permit physical examination. He refuses to allow blood draws for laboratory testing.

7. His pre-hunger strike weight was 175 lbs. according to the transfer records sent on

December 7, 2025.

8.      Upon transfer to Krome on December 7, 2025, Mr. Kilko refused to sign a medical consent form.  He also refused physical examination.  Upon observation, he walked unassisted and was able to move all of his extremities.  He was coherent.  I have counseled Mr. Kilko that his consumption of fluids is insufficient to prevent imminent bodily harm or death, should he continue his strike, in light of the prolonged length of his strike, 36 days and 104 missed meals.

9.      Mr. Kilko's last known weight was taken on November 14, 2025 and reflected that he weighed 161 lbs., reflecting a loss of 14 lbs. or 8% of his initial body weight.  Since November 14, patient transfer records indicate that Mr. Kilko's last physical examination was November 16, 2025.

10.     While detained in Georgia, Mr. Kilko communicated with a health care provider in his native language of Russian. He refused to participate in his care, allow for his vital signs to be taken, or to submit to laboratory testing.  Medical staff in Georgia indicated that Mr. Kilko complained of headache, leg spasm, abdominal pain, lightheadedness with position changes, weakness and fatigue. His urine was dark yellow.  As of December 5, 2025, Mr. Kilko's medical records reflected that he refused all medical care, including vital signs, weight check, urinalysis and physical examination. Mr. Kilko also refused to consume food or drink in sufficient amounts to prevent injury or death to himself should he continue not to eat or drink.

11.     On December 2, 2025, Petitioner was seen by a psychiatrist via telemedicine who determined that the patient displays no evidence of a psychiatric condition that would cause him not to eat or drink. He appears to be operating under his own free will.

3

12.     At Krome, with the assistance of a Russian interpreter, Mr. Kilko has been counseled by medical staff on the effects of self-imposed dehydration and starvation on his body.  He has also been informed of the involuntary hydration and nutrition procedures that will be pursued by way of court order to prevent injury and/or death to himself should he continue not to eat. Today, Mr. Kilko has spoken with medical staff in what I believe to be fluent Spanish.

13.     Mr. Kilko remains in custody at  Krome and under medical observation. At Krome, he continues to refuse to allow a full physical examination, vital signs, urinalysis or blood draws for laboratory testing.  He continues to refuse to be weighed.

14.     His lack of cooperation with medical staff since his admission to Krome's clinic on December 8, 2025, has prevented any objective evaluation of his clinical and metabolic status.  Since Mr. Kilko has refused to sign a medical consent, and continues to refuse to submit to laboratory testing, there is no current laboratory data available to monitor renal function or electrolyte disturbances which could be potentially fatal.

15.     It is for this reason that I am requesting a court order for involuntary physical examinations, periodic laboratory tests (blood and urine), daily vital signs with weight, and intravenous hydration, if needed and indicated by laboratory results.

16.     Laboratory tests are needed to evaluate the metabolic state to include electrolytes and kidney function. The laboratory tests that need to be obtained during a hunger strike include:

   a.     Complete metabolic panel.  This test reveals an increase in markers of kidney function in view of any renal injury.  The panel tests blood urea nitrogen (BUN) creatinine level and proteins.  It also reveals electrolyte disturbances that can lead to heart arrhythmias such as potassium, phosphate, magnesium and glucose levels.

   b.     Complete blood count.   This test reveals the hemoglobin level.

c.      Urinalysis, which reveals the presence of ketones, blood and crystals in the urine.

d.      Thiamine levels to assess deficiency at day 14 of a hunger strike.

e.      Electrocardiogram, if the patient shows elevated potassium, which can lead to arrhythmias.

f.      Creatinine phosphokinase (CPK), which is an enzyme found inside muscle cells and is released into the blood when the muscle cells rupture. The increase in CPK can lead to rhabdomyolysis, a breakdown of muscle tissue that can fatally damage other vital organs.

g.      Prealbumin, used as a marker for nutritional status evaluation. Prealbumin will decrease over time the longer a patient fails to consume adequate nutrition, and the prealbumin level correlates with patient morbidity and mortality risk. Normal prealbumin is 15-35 mg/dL. When prealbumin falls to 5-11mg/dL, significant morbidity risks exist, and aggressive nutritional support is necessary.

17.      It is difficult to predict for how long the human body can survive without food; if an individual does not have adequate fat stores, this time decreases significantly. If an individual goes without water for approximately eight to ten days, he will suffer from dementia and delirium seizures and ultimately become unconscious. Dehydration greatly accelerates a progressive starvation because the waste that the body produces is not excreted. Death by terminal total fasting occurs by acute depletion of thiamine, causing fatal arrhythmia and/or cardiac arrest.

18.      Mr. Kilko's condition is expected to decline as his hunger strike continues. Between the 15th and 30th day of a hunger strike, a patient may suffer neurological symptoms which are severe enough to warrant hospitalization. Mr. Kilko is already exhibiting signs and symptoms of orthostatic blood pressure changes which are caused by dehydration and may cause dizziness. In addition, the patient has had a decreased urinary output, which is indicative of both dehydration and hypotension.

5

19.     Medical literature reflects that metabolic imbalance, caused by fasting, is likely to result in permanent bodily damage and/or death once weight loss reaches 18% of the patient's initial weight.

20.     The medical staff has explained to Mr. Kilko the medical necessity to eat to preserve his health and the medical risks of continuing his hunger strike. Other staff members have repeatedly talked to the patient in attempts to convince him to eat solid foods, liquid or bland diets, and/or drink nutritional supplements. However, Mr. Kilko has continued to refuse to eat solid food and/or drink nutritional supplements.

21.     I have personally explained to Mr. Kilko my concerns regarding his condition and the medical risks involved with a continuing lack of sufficient nourishment, especially in view of the current duration of his strike. That is, he risks significant and ongoing metabolic changes induced by his decreased nutritional intake. If he continues his hunger strike, he will reach a state of severe metabolic imbalance, with a high risk of adverse consequences such as permanent damage to his kidneys, liver, heart failure and the risk of death. Mr. Kilko stated to me that he would continue his hunger strike.

22.     In my professional medical judgment, if Mr. Kilko continues his hunger strike, with the aggravating factor of inappropriate oral hydration, he will reach the point where he will require immediate medical intervention to prevent further deterioration and serious medical complications. Continued fasting will result in permanent damage to his internal organs and has the potential to become life threatening. Metabolic imbalance, if left untreated, will cause fatal arrhythmia and/or cardiac arrest.

23.     It is necessary to perform laboratory tests and physical evaluation to monitor and assess his clinical condition.

24.     Mr. Kilko's lack of nutritional intake compounded by his voluntary dehydration can drastically exacerbate the effects of his hunger strike.

25.     Involuntary hydration will be pursued only as necessary to prevent injury, further dehydration, malnourishment, organ failure, or loss of life due to his self-imposed hunger strike.

26.     The issuance of a court order to perform involuntary medical monitoring, to include blood draws and all necessary physical examinations, is medically necessary to preserve and sustain Mr. Kilko's health, welfare, medical safety, and life. Involuntary intravenous hydration will be pursued upon receipt of medical laboratory testing indicating it is medically necessary.

27.     To ensure the patient's health, welfare, medical safety, preservation of life, should the patient refuse to cooperate with laboratory blood draws and/or involuntary hydration, medical soft restraints will be required to immobilize the patient and prevent unnecessary injury to both the patient and medical staff.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of December, 2025.

Manuel E. Lopez Diaz, M.D.
Staff Physician